# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| U.S. RING BINDER, LP, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:08cv0583 TCM |
| ) | |
| STAPLES THE OFFICE ) | |
| SUPERSTORE LLC, et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM AND ORDER ON CLAIM CONSTRUCTION

Plaintiff, U.S. Ring Binder, L.P., initiated this patent action against Defendants[1] for infringement of its ring binder with low profile ring metal, United States Patent No. 5,816,729 ("the '729 patent"). The parties filed a joint construction request seeking construction of various claim terms of the patent. A claim construction hearing was conducted on February 18, 2009, at which counsel presented arguments but no testimony. Having considered the arguments and briefs filed by the parties, the Court construes disputed claims in the '729 patent as set forth below.

## Claim Construction Principles

"An infringement analysis requires two steps: (1) claim construction to determine the scope and meaning of the asserted claims, and (2) a comparison of the properly construed claims with the allegedly infringing device or method to determine whether the device or

---

[1]Defendants are Staples The Office Superstore, LLC; World Wide Stationery Manufacturing Co., Ltd.; Charles Leonard National, Inc.; and Charles Leonard Western, Inc. For ease of reference, they shall be collectively referred to as "Defendants."

method embodies every limitation of the claims." **IMS Tech., Inc. v. Haas Automation, Inc.**, 206 F.3d 1422, 1429 (Fed. Cir. 2000). "[T]he construction of a patent, including terms of art within its claim, is exclusively within the province of the court." **Markman v. Westview Instruments, Inc.**, 517 U.S. 370, 372 (1996). "[J]udges, not juries, are better suited to find the acquired meaning of patent terms." **Id.** at 388.

In determining the proper construction of a claim, the Court should first be guided by intrinsic evidence, i.e., the words of the claim, the specification, and the patent prosecution history, and, if an analysis of the intrinsic evidence alone does not resolve an ambiguity in a disputed claim term, by extrinsic evidence, e.g., expert testimony, inventor testimony, or dictionaries. **Vitronics Corp. v. Conceptronic, Inc.**, 90 F.3d 1576, 1582, 1583, 1584 (Fed. Cir. 1996). "[The] intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." **Id.** at 1582.

In reviewing the intrinsic evidence, the Court first looks to "the words of the claim themselves, both asserted and nonasserted, to define the scope of the patented invention." **Id.** Accord **North Am. Vaccine, Inc. v. Am. Cyanamid Co.**, 7 F.3d 1571, 1575 (Fed. Cir. 1993). "Although words in a claim are generally given their ordinary and customary meaning, a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history." **Vitronics Corp.**, 90 F.3d at 1582 (citing Hoechst Celanese Corp. v. BP Chems., Ltd., 78 F.3d 1575, 1578 (Fed. Cir. 1996)). See also

**DeMarini Sports, Inc. v. Worth, Inc.**, 239 F.3d 1314, 1324 (Fed. Cir. 2001) (cautioning that the ordinary meaning of a term cannot be looked at in a vacuum, but must be examined in the context of the patent's written description and prosecution history).  There is "a 'presumption that the same terms appearing in different portions of the claims should be given the same meaning unless it is clear from the specification and prosecution history that the terms have different meanings at different portions of the claims.'" **PODS, Inc. v. Porta Stor, Inc.**, 484 F.3d 1359, 1366 (Fed. Cir. 2007) (quoting Fin Control Sys. Pty., Ltd. v. OAM, Inc., 265 F.3d 1311, 1318 (Fed. Cir. 2001)).  Additionally, "[d]ifferences among claims can also be a useful guide in understanding the meaning of particular claim terms." **Phillips v. AWH Corp**, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc).  "For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."  **Id.** at 1314-15.

"The claims, of course, do not stand alone.  Rather, they are part of a fully integrated written instrument, consisting principally of a specification that concludes with the claims," and "must be read in view of the specification, of which they are a part."  **Id.** at 1315 (internal quotations omitted).  See also **North Am. Vaccine, Inc.**, 7 F.3d at 1576 ("When the meaning of a claim term is in doubt, [the court] look[s] to the specification for guidance.").  Specifications, the second of the three types of intrinsic evidence, must therefore be reviewed to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning.  **Vitronics Corp.**, 90 F.3d at 1582.  "'[T]he specification is always highly

relevant to the claim construction analysis,'" and "'is the single best guide to the meaning of a disputed term.'" **Honeywell Int'l, Inc. v. ITT Indus., Inc.**, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (quoting Phillips, 415 F.3d at 1315). "[C]are must be taken[, however,] to avoid reading limitations appearing in the specification . . . into [the] claims." **Interactive Gift Express, Inc. v. Compuserve, Inc.**, 256 F.3d 1323, 1331 (Fed. Cir. 2001) (internal quotations omitted) (last alteration in original). "[T]here is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification." **Id.** at 1331-32 (internal quotations omitted).

In addition to the words of the claim and the specification, "the court may also consider the prosecution history of the patent, if in evidence." **Vitronics Corp.**, 90 F.3d at 1582. The prosecution history is "the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims," **id.**, and any "[a]rguments and amendments made during the prosecution of a patent application[,]" **Southwall Techs., Inc. v. Cardinal IG Co.**, 54 F.3d 1570, 1576 (Fed. Cir. 1995). It "'can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be.'" **Aero Products Int'l, Inc. v. Intex Recreation Corp.**, 466 F.3d 1000, 1010 (Fed. Cir. 2006) (quoting Phillips, 415 F.3d at 1317). See also **Southwall Techs., Inc.**, 54 F.3d at 1576 (noting that "[t]he prosecution history limits the interpretation of claim terms

so as to exclude any interpretation that was disclaimed during prosecution"); **Arlington Indus., Inc. v. Bridgeport Fittings, Inc.**, 345 F.3d 1318, 1328 (Fed. Cir. 2003) ("In the course of prosecuting a patent application, a patentee may redefine a claim term."); **Ekchian v. Home Depot, Inc.**, 104 F.3d 1299, 1304 (Fed. Cir. 1997) ("[S]ince, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover, he is by implication surrendering such protection.").

If, after consideration of "all available intrinsic evidence," there remains "some genuine ambiguity in the claims," the court may look at extrinsic evidence. **Vitronics Corp.**, 90 F.3d at 1584. Dictionaries are a form of extrinsic evidence that "hold a special place and may sometimes be considered along with the intrinsic evidence," **Interactive Gift Express, Inc.**, 256 F.3d at 1332 n.1, "so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents," **Vitronics Corp.**, 90 F.3d at 1584 n.6.

"Throughout the construction process, [however,] it is important to bear in mind that the viewing glass through which the claims are construed is that of a person skilled in the art." **Interactive Gift Express, Inc.**, 256 F.3d at 1332. See also 35 U.S.C. § 112, ¶ 1 (providing, in relevant part, that "[t]he specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms *as to enable any person skilled in the art to which it pertains*, or with which it is most nearly connected, to make and use the same, . . . .") (emphasis added).

The above-described two-step infringement analysis of a claim is to be employed when examining claim limitations drafted pursuant to 35 U.S.C. § 112, ¶ 6. "Limitations contemplated by § 112, ¶ 6, often referred to as means-plus-function or step-plus-function limitations, recite a specified function to be performed rather than the structure, material, or acts for performing that function." **IMS Tech., Inc.**, 206 F.3d at 1429. Section 112, ¶ 6 provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

"The literal scope of a properly construed means-plus-function limitation does not extend to all means for performing a certain function. Rather, the scope of such claim is sharply limited to the structure disclosed in the specification and its equivalents." **J & M Corp. v. Harley-Davidson, Inc.**, 269 F.3d 1360, 1367 (Fed. Cir. 2001).

"Claim construction of a means-plus-function limitation includes two steps. First, the court must determine the claimed function. Second, the court must identify the corresponding structure in the written description of the patent that performs that function." **Applied Med. Res. Corp. v. United States Surgical Corp.**, 448 F.3d 1324, 1332 (Fed. Cir. 2006) (interim citation omitted).

> [T]he second step . . . begins with determining whether the accused device or method performs an identical function to the one recited in the claim. If the identical function is performed, the next step is to determine whether the accused device uses the same structure, materials, or acts found in the

specification, or their equivalents.² Whether an accused device or method infringes a claim with a § 112, ¶ 6 limitation, i.e., whether it performs the identical function with the same structure, materials, or acts described in the specification or an equivalent thereof, is a question of fact.

**IM Tech., Inc.**, 206 F.3d at 1430 (interim citations omitted).

"If the court determines that a claim is not 'amenable to construction,' then the claim is invalid as indefinite under 35 U.S.C. § 112, ¶ 2." **Honeywell Int'l, Inc. v. Int'l Trade Comm'n**, 341 F.3d 1332, 1338 (Fed. Cir. 2003). "The definiteness requirement of § 112, ¶ 2 focuses on whether the claims, as interpreted in view of the written description, adequately perform their function of notifying the public of the [scope of the] patentee's right to exclude." **Id.** (internal quotations omitted) (alteration in original). "Because a claim is presumed valid, a claim is indefinite only if it is insolubly ambiguous, and no narrowing construction can be properly be adopted." **Id.** at 1338-39 (internal quotations omitted).

Mindful of the foregoing analytical framework, the Court turns to an examination of the Claims in dispute,³ referring to the Claims by the labels used by the parties.

## Discussion

**Claim 1, Issue 1:**

---

²"The doctrine of equivalents prevents an accused infringer from avoiding infringement by changing only minor or insubstantial details of a claimed invention while retaining their essential functionality." **Sage Prods., Inc. v. Devon Indus., Inc.**, 126 F.3d 1420, 1424 (Fed. Cir. 1997). "In the context of section 112, however, an equivalent results from an insubstantial change which adds noting of significance to the structure, material, or acts disclosed in the patent specification." **Valmont Indus., Inc. v. Renike Mfg. Co.**, 983 F.2d 1039, 1043 (Fed. Cir. 1993).

³The parties were able to resolve their disagreements about many of the claims originally submitted as requiring construction.

### a release lever

Plaintiff argues that the above term is unambiguous and readily comprehensible to the finder of fact; consequently, Plaintiff provides no definition for this term. Defendants propose that the term be defined as follows:

> [A] rigid bar that pivots about one point and that is used to move an object at a second point by a force applied at a third. The rigid bar attaches to and is retained by the leaves of the ring binder and does not rock about a pin or incorporate or rely on any additional mechanisms or fasteners to provide for operation of the lever.

At the claim construction hearing, all parties agreed that "release lever" is one of the two most significant terms in the patent for purposes of this claim construction litigation.

Defendants arrived at the first part of their definition from a dictionary defining the term lever.

The second part of Defendants' definition is extracted from the prosecution history.

According to the specifications in the '729 patent, the release lever is made up of a "thumb or finger plate" and a "lever arm" beneath the plate. ('729 patent, col. 3, ll. 36-38.) The "release levers" are mounted on opposite ends of the ring metal and move the hinged leaves to open and close the binders. (Id. at col. 3, ll. 31-34.) The specifications further provide that "[e]ach release lever extends longitudinally of and co-planar with [the] cover of the ring metal." (Id. at col. 13, ll. 34-36.) "Each release lever includes a thumb or finger plate and a lever arm." (Id. at col. 13, ll. 36-37.) The claim language provides that the release lever is located at one end of the shield and includes "a finger plate sized to receive a finger of the user" to move the levers to open and close the binder. (Id. at col. 4, ll. 66-col.

5, ll. 4.) The patent abstract advises that "[b]oth release levers extend substantially co-planar to the cover" and "generally correspond[] to the length" of the paper stored, thereby allowing the size of the binder to be smaller. (Id. at 1.) The background section claims an advantage of the patent is that it provides for a ring binder with ring metal shorter than conventional binders for the same size of paper. (Id. at col. 2, ll. 20-23.)

In response to an Office Action of December 18, 1997, the patentee provided a distinction between the '729 patent and the Trussell patent. (Plf. Ex. A at 58.) This response concentrated, at least partially, on the lever arm and advises the Patent and Trademark Office that the Trussell patent teaches away from the claim release lever. A careful reading of that excerpt, however, makes it clear that the response is addressing the function of the lever arm.

The Court finds that the claim term "a release lever" can be defined using the language, teachings, and limitations set out in the patent specifications and claim language. Accordingly, the Court construes the term "a release lever" as follows:

> **A rigid bar mounted at opposite ends of the cover or shield extending longitudinally of and coplanar with cover or shield sized to fit the finger of user and operable by user of ring binder to move leaves to open and close the binder. Each release lever includes a thumb or finger plate and a lever arm.**

**Claim 1, Issue 2:**

**finger plate**

It is Plaintiff's position that the term "finger plate" is unambiguous and is readily comprehensible to the finder of fact. Defendants provide the following definition of finger

plate: "[S]urface area of the lever to which the user's finger will come in contact during operation."

Plaintiff argues that Defendants' construction does not add clarity and will, in fact, confuse the finder of fact. Plaintiff further argues that "during operation" is unclear.

Although the Court agrees that the term "finger plate" requires no definition, the Court's reasoning differs from that of Plaintiff. Defendants' definition will not confuse the fact finder because the term "finger plate" speaks for itself. Moreover, the operation of a finger plate is obviously to open the binder. This is not unclear.

The specifications provide that the release lever includes a "thumb or finger plate." ('729 patent, col. 3, ll. 36-37.) The claim language teaches that the finger plate is sized to receive a finger of the user. (Id. at col. 5, ll. 1-3.) Defendants cite the prosecution history which repeats what is in the patent claim and specification – the finger plate is sized to receive the finger of a user, allowing for greater leverage. (Pl Ex. A at 57.)

The Court finds no mystery here. Therefore, the Court declines to define this unambiguous term.

**Claim 1, Issue 3:**

**sized to receive a finger of the user**

Again, Plaintiff argues that this term is unambiguous and is readily comprehensible to a finder of fact. Defendants propose the term be defined as: "[O]f a size such that the entire finger of the user is capable of making contact. The entire finger is understood to include the distal, middle, and proximal phalanx."

Defendants cite the prosecution history of the patent in which the patentee claimed that the invention "accommodates the entire finger of the user, allowing for greater leverage and easier opening of the binder." (Plf. Ex. A at 57.) The patentee distinguished the Trussell patent which, according to the patentee, "does not disclose a finger plate that is sized to receive a finger of the user." (Id.)

As discussed above, the patent specifications teach that the release lever includes a thumb or finger plate. ('729 patent at col. 3, ll. 36-37.) The claim itself provides that the finger plate is sized to receive a finger of the user to actuate the release levers. (Id. at col. 5, ll. 2-4.) The only place in which the advantage of this design is discussed is in the prosecution history cited above. The Court agrees that the patent teaches that an advantage to the '729 patent design is a reduction in the size of the ring binder. (See id. at col. 2, ll. 4-7.) On the other hand, the prosecution history emphasizes the leverage advantage in the extended size of the finger plate. However, to define the instant term as proposed by Defendants adds too much detail and complexity, which are not taught in the specifications or the claim language of the patent.

For the foregoing reasons, the Court construes "sized to receive a finger of the user" as follows:

> **Of such a size to allow greater leverage for easier opening of the binder when applying the finger of the user.**

## Claim 1, Issue 4:

> **release levers**

Plaintiff again takes the position that this term is unambiguous and comprehensible by the finder of fact. Defendants propose the following term definition:

> [N]o less than two rigid bars that pivot about a respective one point and that are used to move an object at a second point by a force applied at a third. Said rigid bars attach to and are retained by the leaves of the ring binder and do not rock about a pin or incorporate or rely on any additional mechanisms or fasteners to provide for operation of the levers.

Plaintiff argues that using the plural "levers" is a mistake in Claim 1; the term should be the singular, "lever." Plaintiff points to the use of the plural "release levers" in Claim 12 to specifically address the patentee's intent in that claim. Consequently, if the patentee had intended to refer to more than one lever in Claim 1, the claim language would have specifically stated. Defendants direct the Court to specification language that does not specify two release levers. (See col 3, ll. 63-66 ("As shown in the drawing, the overall length of the ring metal, including the release lever*s* at each end of the ring metal.") and col. 3, ll. 31-32 ("[m]ounted on opposite ends of the ring metal are release lever*s*").

When reading the entire specification and claim language together, Plaintiff's argument fails. The Court does not detect a misprint or mistake in Claim 1. The plural "levers" was intended.

For the foregoing reasons, the Court construes "release levers" as follows:

**Rigid bars mounted at opposite ends of the cover or shield extending longitudinally of and coplanar with cover or shield sized to fit the finger of the user and operated by the user of the binder to move leaves to open and close binder. Each release lever includes a thumb or finger plate and a lever arm.**

**Claim 1, Issue 5**

### into engagement with

Once again, Plaintiff argues that the term is unambiguous and requires no definition. Again, Defendants propose a definition, i.e., "physically attached to and retained by."[4]

Neither party cites to the patent specification or claim language to support a definition of this term. Defendants direct the Court to that portion of the prosecution history which provides that the lever arm "attaches to the leaves of the binder." (Plf. Ex. A at 58.) The Court notes that Defendants define "into engagement with" and "a lever arm contacting said leaves" from Claim 7, Issue 1 with exactly the same definition – "physically attached to and retained by." As Plaintiff notes, however, the term "engage" is broader than the term "attach." For example, as noted by Plaintiff, two gears of a machine can be engaged with each other without being attached to each other.

"Engagement" is defined, inter alia, as "the state of being in gear or in such contact that motion may be transmitted[.]" Webster's Third New International Dictionary, 751 (2002). Plaintiff's analogy and argument are sound. Defining the term engagement as physically attached and/or retained by is too narrow. The Claim 1 language at issue provides "a lever arm extending from said finger plate into engagement with said leaves to allow for movement of said leaves when said finger plate is actuated by user . . . ." ('729 patent at col. 5, ll. 3-6.) The Court finds the term "into engagement with" as used in this Claim to be unambiguous. It is a term that does not require claim construction.

---

[4]The Court notes that Defendants propose this same definition for the term "a lever arm contacting said leaves" from Claim 7, Issue 1.

**Claim 1, Issue 6**

**extending substantially coplanar**

Plaintiff proposes the following definition: "[S]said finger plate extending substantially in the same plane as said shield allowing sheets of paper to lie flat atop the ring metal assembly."

Defendants propose the following definition: "The housing having a surface and the finger plate lying entirely within the longitudinal projection of that surface or within standard manufacturing tolerances thereof."

The parties agree that this term is the second of the two most significant terms to be defined in this case.[5]

Plaintiff refers the Court to the patent specifications which teach that the difference between this invention and other ring binders can be discerned by looking at figures 5 and 6 in the patent.

> Because of the construction of a conventional release lever L, the thumb or finger portion of the release lever must extend beyond the end of the sheet of paper by a distance D. [See figure 6.] This is not so with the release mechanism of the lower profile ring metal **20**. Now, the end of the ring metal and sheet of paper coincide. . . . Because each release lever **44, 46** [see figure 3] has a, [sic] contour generally corresponding to that of the release lever, the sheets of paper lie flat atop the ring metal assembly.

('729 patent at col. 4, ll. 12-22.) This advantage of the '729 patent is also generally discussed in the background section of the patent. (See id. at col. 1, ll. 26-48.) Plaintiff's

---

[5]The other is the term "a release lever" in Claim 1, see pages 8-10, supra.

definition is consistent with the teachings of the patent specifications. Defendants' proposed definition is not.

Because of the clear language of the teaching of the above-cited specification language, there is no need for extrinsic evidence to define this term. Additionally, there is nothing in the dictionary definition of these two words that is inconsistent with Plaintiff's proposed definition.

For the foregoing reasons, the Court construes the term "extending substantially coplanar" as:

> **Extending substantially coplanar means said finger plate extends substantially in the same plane as said shield allowing sheets of paper to lie flat atop the ring metal assembly.**

## Claim 1, Issue 7

### generally corresponding to

Plaintiff again argues that this term is unambiguous and requires no definition. Defendants propose the following definition: "exactly equal to or less than."

Defendants' definition is too narrow and places an improper emphasis on "exactly." The patent specifications teach that the "end of the ring metal and sheet of paper coincide" and that "sheets of paper whose length exceed that of the ring metal could also be stored in the binder." ('729 patent at col. 4, ll. 16, 18-20.) Figure 3 demonstrates that the end of the paper coincides with the end of the device. "Generally corresponding to" covers each of these possibilities.

The Court agrees with Plaintiff. The term is unambiguous and is readily comprehensible to the finder of fact.

**Claim 1, Issue 8**

**length of a sheet of paper stored in the binder**

Plaintiff argues that this term is unambiguous and readily comprehensible to a finder of fact; it requires no definition. Defendants propose that the term be defined as: "longitudinal length of the paper selected by the user of the binder and placed within the binder by the user."

The Court agrees with Plaintiff – no definition is required for this term.

**Claim 1, Issue 9**

**overall size of the binder**

Plaintiff argues that the term also requires no definition. Defendants propose that the term be defined as: "overall longitudinal length including shield and levers."

The language of the Claim relates the length of the paper to the overall size of the binder; therefore, Defendants are on the right track. The size of the binder as used in this Claim relates to its length and the length of a sheet of paper. Accordingly, the Court construes the term "overall size of the binder" as:

**The overall size of the binder means the overall length of the binder.**

**Claim 2, Issue 1**

**arcuate contour**

Plaintiff again supplies no definition of this term and argues that it is unambiguous and is readily comprehensible to the fact finder. Defendants propose that the term be defined as: "curved or arc shaped cross section."

Neither party cites any specification or claim language supporting a definition. "Arcuate" is defined as "[c]urved like a bow, arc-shaped, arched." <u>Oxford English Dictionary</u>, <u>http://dictionary.oed.com/cgi/entry/50011649?query_type=word&queryword =arcuate</u> (last visited March 17, 2009). "Contour" needs no dictionary definition.

For the foregoing reasons, the Court construes the term "arcuate contour" as:

**Curved or arc shaped contour.**

### Claim 2, Issue 2

#### corresponding to

Plaintiff proposes no definition and argues that the term is unambiguous and readily comprehensible to the finder of fact. Citing a dictionary definition of "corresponding," Defendants propose the term be construed as: "having the same or nearly the same."

No citation from the patent is provided by either party. The Court finds that this term requires no definition and is unambiguous and readily comprehensible.

### Claim 7, Issue 1

#### contacting

Plaintiff argues that the term contacting is unambiguous and requires no definition. Defendants propose the same definition to the term "contacting" as they proposed for the term "into engagement with" for Claim 1, Issue 5, i.e., "physically attached and retained by."

Defendants defend this definition by citing the same prosecution history previously cited. (See Plf. Ex. A at 58.) Again, there is no citation to the patent language or patent specification by either party.

The Court finds the term "contacting" to be unambiguous and easily comprehensible by the finder of fact. It therefore declines to define such term.

/s/ Thomas C. Mummert, III

THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 18th day of March, 2009.